# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
February 22, 2012 Session

## STATE OF TENNESSEE v. STEVEN WAYNE WILSON

**Appeal from the Circuit Court for Sequatchie County**
**No. 4568     Thomas W. Graham, Judge**

---

**No. M2011-00004-CCA-R3-CD - Filed July 25, 2012**

---

A Sequatchie County Circuit Court jury convicted the defendant, Steven Wayne Wilson, of first degree felony murder, *see* T.C.A. § 39-13-202(a)(2), and especially aggravated burglary, *see id.* § 39-14-404. Following the jury's verdicts, the trial court modified the especially aggravated burglary conviction to aggravated burglary by operation of law, *see id.* § 39-14-404(d), and imposed an effective sentence of life in prison with the possibility of parole, also by operation of law, *see id.* § 39-13-208(c). On appeal, the defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erroneously denied his motion to suppress, (3) the trial court erroneously admitted and excluded evidence during Agent Mark Wilson's testimony, (4) the trial court erroneously admitted expert testimony via an unqualified witness, (5) the State failed to disclose exculpatory evidence, (6) the trial court erroneously instructed the jury regarding the elements of felony murder as charged in this case, (7) the trial court's rulings and comments evinced judicial bias requiring recusal, (8) the trial court erroneously excluded as hearsay the statements of two witnesses, (9) the trial court erroneously admitted the autopsy report as an exhibit at trial, (10) the trial court erroneously admitted physical evidence without establishing a proper chain of custody, (11) the overall conduct of the trial deprived the defendant of his right to a fair trial under the Tennessee Constitution, and (12) the cumulative effect of the trial errors deprived the defendant of his right to a fair trial. Following an extensive review, we determine that the evidence is sufficient to support the convictions and that the trial court committed no reversible error. Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and JEFFREY S. BIVINS, JJ., joined.

B. Jeffrey Harmon, District Public Defender; and Philip A. Condra, Assistant Public Defender, for the appellant, Steven Wayne Wilson.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steve Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On the morning of September 29, 2002, George Russell Hayes went to the camper-trailer of the victim, Christopher Yaeger, to pick the victim up for work. Being 30 minutes late, Mr. Hayes assumed that the victim had fallen back to sleep when he arrived and did not find the victim waiting outside. Mr. Hayes blew the horn of his vehicle "a couple of times," but he received no response from the victim. He stepped inside the trailer and "hollered," but he received no response from the victim. Mr. Hayes walked to the bedroom where he discovered the victim "l[]ying in the bed . . . [with] blood everywhere, splattered." Mr. Hayes recalled that he did not know if the victim was dead. Because "it scared [him]," Mr. Hayes left the trailer.

As he exited the trailer, Mr. Hayes saw the victim's girlfriend, Monica Dollar, lying on the living room sofa. He testified that he asked Ms. Dollar, "'Why didn't you call an ambulance for him? He looks like he's beat to death.'" Mr. Hayes testified that Ms. Dollar "just kind of giggled and rolled over and covered up on the blankets and went back to sleep." Mr. Hayes then drove home to telephone 9-1-1 and the victim's mother.[1] He returned to the victim's trailer to wait for the police and found Ms. Dollar still asleep on the sofa. The victim's mother, Kay Sisemore, arrived and walked to the victim's bedroom. She returned from the bedroom crying. Mr. Hayes recalled that "then we got [Ms. Dollar] up." The police soon arrived, as well as several curious neighbors, including Ms. Dollar's mother, Dizzy Ridgeway. Mr. Hayes overheard Ms. Ridgeway telling Ms. Dollar not to talk to anyone. He also heard Ms. Ridgeway assure Ms. Dollar that Ms. Ridgeway would get her a lawyer. Mr. Hayes recalled that Ms. Dollar was not injured in any way.

Kay Sisemore, the victim's mother, testified that her son was 30 years old when he was found dead in his trailer on September 29, 2002. She said that she had last seen him the previous evening at approximately 6:00 p.m. when he was at his grandmother's house to do yard work. Ms. Sisemore recalled that Ms. Dollar, who had lived with the victim "off and on," was with the victim on September 28. She said that Mr. Hayes, the victim's employer, telephoned her on the morning of September 29 and told her that she needed to get to the victim's trailer. She found the victim "l[]ying on the bed." She recalled that the victim "had on his jeans and a tee shirt and he was not moving." She said:

---

[1] Several witnesses testified that the victim did not have a telephone in his trailer. Likewise, several witnesses were unsure whether the victim owned a cellular telephone at the time of his death.

I spoke to him and he didn't respond. I knew it was my son
because I could tell it was his body, but his face did not look like
my son. I touched his ankle and I touched his wrist, and they
were cold, and I sat with him for a while.

Ms. Sisemore described the victim's face as "misshapen" and "swollen." She testified that
there was "[n]ot so much" blood on the victim's face as there was "on his shirt and on the
walls." Ms. Sisemore recalled that Ms. Dollar was "under a blanket on the sofa." She said
that Ms. Dollar came outside later and that Ms. Dollar was dressed in the same clothing she
had worn the night before. Ms. Sisemore saw no injuries or blood on Ms. Dollar.

Sequatchie County Sheriff's Department ("SCSD") Chief Deputy Randall
Lockhart, a road officer with the SCSD in September 2002, arrived at the victim's trailer at
7:40 a.m. on September 29, 2002, to find Mr. Hayes, Ms. Sisemore, and Ms. Dollar standing
outside. Chief Deputy Lockhart recalled that Ms. Dollar had no apparent injuries or blood
on her. He went to the victim's bedroom to check on the victim's condition, secured the
scene, and waited for the emergency medical technicians ("EMTs") to arrive. Soon
thereafter, two EMTs arrived and verified that the victim had died.

Although Chief Deputy Lockhart did not announce the victim's death on the
police radio, he did request assistance from the Tennessee Bureau of Investigation ("TBI")
via radio. He testified, "[Y]ou don't put things over the air that will draw a crowd."
Nevertheless, a crowd of more than 10 people soon gathered around the small camper-trailer.
Chief Deputy Lockhart recalled seeing Ms. Ridgeway in the crowd, but he did not overhear
any conversations between Ms. Ridgeway and Ms. Dollar. He did not interview any of the
"curious bystanders." He only made sure no one entered the trailer after his arrival at the
scene.

On the morning of September 29, 2002, TBI Agent Billy Miller searched the
victim's trailer and surrounding area for "any type of weapon" or evidence that "indicated
any type of struggle." Through his experience and training in law enforcement, Agent Miller
testified to his familiarity with blood spatter – the pattern blood forms when landing on a
surface, particularly walls, ceilings, or floors. Agent Miller recalled that the victim suffered
facial and head lacerations. He observed blood spatter from the headboard to the footboard
of the victim's bed and on the plastic covering of a nearby window, but he saw no blood
spatter on the ceiling of the trailer.

Agent Miller observed that the victim was found in his stocking feet. He
discovered the victim's shoes in the living room. He examined the shoes and determined that
they did not contain any blood evidence. In the nearby kitchen, however, Agent Miller

collected a wok and wok lid that appeared to have a "foreign substance" on it. On the victim's bed, Agent Miller found a piece of wood that matched the broken handle of the wok lid. He forwarded these items to the TBI Crime Laboratory for serology and fingerprint analyses. Agent Miller recovered a baseball bat from the living room, which he also sent to the TBI Crime Laboratory.

Agent Miller opined that there was no sign of a struggle, but he observed that the trailer was "not the neatest trailer in the world." During the course of his investigation, Agent Miller collected fingerprints from several individuals: Ms. Dollar (the victim's girlfriend), John Flores (Ms. Dollar's older son), Mark Ridgeway (Ms. Dollar's step-father), Bobby Dollar (Ms. Dollar's younger son), and Ms. Ridgeway (Ms. Dollar's mother). The investigation was still open when Agent Miller was transferred to another division of the TBI. During his investigation, he never interviewed the defendant.

On cross-examination, Agent Miller testified that the medical examiner removed the victim's clothing during the autopsy and that he did not request the victim's clothing for laboratory analysis. He recalled interviewing Ms. Dollar near the time of the victim's death. At the time of trial almost four years later, Agent Miller did not know Ms. Dollar's exact whereabouts, but he had learned that she was possibly living in California. Likewise, he did not know where Ms. Dollar's sons, Messrs. Flores and Dollar, were living at the time of trial. Agent Miller testified that the ceiling height of the trailer measured approximately 77 inches. He opined that the height of the trailer would render difficult any overhead swing of the wok, but he said that such a swing, coupled with contact with the ceiling, could have possibly caused the handle of the wok to break.

On September 15, 2004, almost two years after the victim's death, Chattanooga Police Department crime scene technician Roy Ellen Lamarre took the defendant's "major case prints" consisting of all ten fingers and the side and palm of each hand via a "seizure and search warrant" issued by the Hamilton County Criminal Court. Officer Lamarre then turned the prints over to TBI Agent Mark Wilson.

TBI serologist Mike Turbeville examined the wok, wok lid, broken wok handle, and aluminum baseball bat for the presence of human blood. The wok, wok lid, and handle piece all tested positive for the presence of human blood. The aluminum baseball bat, however, contained no blood evidence. Because the laboratory never received a "blood standard" from the victim, Agent Turbeville did not perform any deoxyribonucleic acid ("DNA") testing on the items in an effort to determine the donor of the blood.

Cassie Lovato, Ms. Ridgeway's granddaughter and Ms. Dollar's niece, testified that she was 16 years old at the time of the victim's death. She remembered the victim as her

mother's "good friend" and knew that the victim and Ms. Dollar had been in a "relationship" at the time of his death.

Ms. Lovato visited Ms. Ridgeway on the evening of September 28 with the defendant, who was her boyfriend at that time. She testified that she spent the evening with Ms. Ridgeway, Mr. Ridgeway, Kurt Lovato (her uncle), and the defendant "hanging out, listening to music." She recalled that Mr. Ridgeway, the defendant, and Mr. Lovato also drank beer that night. Ms. Lovato testified that sometime during the evening Ms. Ridgeway received a telephone call from Ms. Dollar. Ms. Lovato testified that Ms. Ridgeway told the group that Ms. Dollar had told Ms. Ridgeway that the victim had "smacked" Ms. Dollar. When Ms. Ridgeway told the group what had happened, the defendant said that the victim "needed to be taught a lesson to hit on a man and not a woman."

Ms. Lovato testified that later that night Ms. Ridgeway drove everyone to the store to purchase more beer. On their way, they stopped at the victim's trailer. The defendant was the only person who left the vehicle and entered the victim's trailer. From the vehicle, Ms. Lovato saw "a silhouette of two people fighting" in the bedroom. Ms. Lovato said that the defendant was inside the trailer "twenty minutes, probably no longer than that." When he came outside, the defendant "had a little bit of blood on his knuckles." After the defendant returned to the vehicle, the group left to buy beer before returning to Ms. Ridgeway's home. Ms. Lovato said that Ms. Ridgeway awakened her the next morning to tell her that the victim was dead. Ms. Lovato did not speak to the police during the initial investigation. She did, however, talk to the police "several years later."

On cross-examination, Ms. Lovato testified that she had been dating the defendant about one month when the victim died. She said that Ms. Dollar had to go somewhere to call Ms. Ridgeway because the victim did not have a telephone or cellular telephone at his trailer. She recalled that Ms. Dollar telephoned Ms. Ridgeway at approximately 9:00 in the evening and that the group went to get more beer approximately one and one-half hours later. Ms. Lovato testified that, although there was a market located near the Ridgeway home, Ms. Ridgeway drove approximately 15 minutes out of her way to buy beer at a different store so that the group could stop by the victim's trailer. When they returned to Ms. Ridgeway's home, Ms. Lovato and the defendant went to bed. She did not recall seeing any blood on the defendant's clothing, but she admitted that she "didn't pay that much attention" that night to whether his clothes had blood on them.

Ms. Lovato testified that Ms. Ridgeway went out two more times later that night, once to pick up Bobby Dollar and another time to take care of Ms. Dollar's dogs. Ms. Lovato testified that when she awoke at approximately 10:00 the next morning, Ms. Dollar's dogs, a digital video disc player, and one of Ms. Dollar's blankets were at Ms. Ridgeway's

home. She also testified that Ms. Dollar moved to California in 2004, about the time that the investigation into the victim's death resumed. Likewise, Ms. Ridgeway, Mr. Ridgeway, Mr. Flores, and Mr. Dollar had all moved out of state in the years since the victim's death.

Kurt Lovato, Ms. Ridgeway's son and Ms. Dollar's brother, testified that the defendant dated his niece, Cassie, in September 2002. He recalled the night everyone was at Ms. Ridgeway's home when Ms. Ridgeway received a telephone call from Ms. Dollar. He testified that Ms. Ridgeway told everyone that the victim "had been beating on Monica and killed her cat and someone needed to go up there and teach him a lesson." Mr. Lovato testified that the defendant said, "'I would do it,'" so the group "piled [their] drunk butts in the truck and went up" to the victim's trailer on Signal Mountain. Once they arrived at the trailer, Mr. Lovato, who used a wheelchair, stayed in the truck while the defendant went inside. Mr. Lovato said he "could see a vision of [the victim] through the curtains." He said that the defendant was inside the trailer approximately 10 minutes. When the defendant returned to the vehicle, he had blood on his knuckles but no blood on his clothing. Mr. Lovato claimed that the defendant said that "he got him and we needed to go." The group returned to Ms. Ridgeway's home and went to bed. The next morning, Ms. Ridgeway awakened Mr. Lovato after Mr. Hayes telephoned her to tell her about the victim's death.

On cross-examination, Mr. Lovato admitted that everyone except Ms. Ridgeway had "drunk a lot" of beer before going to the victim's trailer. Mr. Lovato also recalled Mr. Flores' telephoning Ms. Ridgeway sometime after 10:00 that night. Mr. Lovato said that the defendant did not know the victim or Ms. Dollar. Mr. Lovato denied any plan to beat the victim but did acknowledge, however, that Ms. Ridgeway commented that "[s]omebody need[ed] to whoop [the victim's] ass" after she got off the telephone with Ms. Dollar. Mr. Lovato reiterated that they "were drunk" when they went to the victim's trailer. He saw the defendant and the victim fighting in the living room and bedroom of the trailer. He did not notice any blood on the defendant's clothing. He testified that no one volunteered information to the police during the initial investigation but that he, Cassie Lovato, and Mark Ridgeway eventually spoke to the police in 2004.

Kimberly Ables testified that she began dating the defendant in February 2004. In March 2004, the defendant confessed to her that he had killed someone. He also told her that he had used a wok to beat the victim. Ms. Ables did not continue her relationship with the defendant much longer after his admission. In September 2004, she spoke to investigators concerning the defendant's admission. On cross-examination, Ms. Ables maintained that she had never met the Ridgeways or the Lovatos. Explaining her failing to report the defendant's confession sooner, she said that she initially did not believe the defendant.

-6-

Doctor Charles Harlan testified that he performed the victim's autopsy in 2002. He diagnosed the victim's cause of death to be a subarachnoid hemorrhage caused by blunt force trauma. He determined that the victim's brain contained "60 cc" of blood, an equivalent of 12 teaspoons, at the time of his death. Doctor Harlan opined that as little as "5 cc" of blood can potentially cause death. He further testified that although some hemorrhages may occur naturally from disease, the victim's hemorrhage was the result of trauma to his head. On cross-examination, Doctor Harlan testified that at the time of trial his medical license was "in limbo" because of allegations of incompetence concerning autopsies performed by him as long ago as 1995.

TBI Agent Linda Littlejohn performed a forensic examination on the wok and handle piece. She determined that the items matched and "had been at one time joined."

TBI Agent Elizabeth Reid examined several pieces of evidence for the presence of latent fingerprints.[2] Through her examination, she determined that no identifiable prints existed on the broken wok handle, wok lid, or aluminum baseball bat. She did discover a palm print located on the intact handle of the wok. Her comparison analysis revealed the palm print did not match John Flores, Mark Ridgeway, Josh Johnson, Monica Dollar, Bobby Dollar, or Dizzy Ridgeway. The palm print did, however, match the latent palm print obtained from the defendant by the CPD in 2004.

TBI Agent Mark Wilson took over the investigation of the victim's death from Agent Miller when Agent Wilson began working with the TBI in 2004. In September 2004, Agent Wilson interviewed several individuals and later obtained the defendant's palm prints and statement. On September 15, 2004, following the execution of a waiver of rights, the defendant gave Agent Wilson a statement concerning his beating the victim.

In his statement, the defendant admitted engaging in an altercation with the victim. The defendant claimed, however, that the victim drove by Ms. Ridgeway's home and threw a rock, hitting the defendant in the back of the head. Soon thereafter, the victim telephoned Ms. Ridgeway's home, and the victim and the defendant "started having words." The two agreed to settle their differences at a bar near the victim's trailer. Ms. Ridgeway drove the defendant and the rest of the group to the bar. The defendant explained that "[e]verybody was telling [him] to kick [the victim's] ass."

When the group arrived at the bar and the defendant exited Ms. Ridgeway's vehicle, the victim "threw the first punch." The victim then led the defendant to his trailer

_____

[2] The transcript reflects Agent Reid's name as "Reed." Her signed exhibited report, however, reflects that her name is spelled "Reid."

where the victim "sic-ed" his dog on the defendant. The defendant told Agent Wilson that he followed the victim inside the trailer where the victim "pulled a knife" and cut the defendant's arm. The defendant claimed he picked up the knife and put it in his pocket. He then grabbed a "pan" and struck the victim "in the side of the head." The defendant claimed he lost control after the first hit and continued beating the victim until the victim fell back on the bed. The defendant stopped beating the victim when he realized that the victim was having trouble breathing.

The defendant told Agent Wilson that he "kept telling [the victim] that [he] was sorry." When he returned to Ms. Ridgeway's vehicle, the defendant suggested taking the victim to the hospital. He told Agent Wilson that Ms. Ridgeway refused and said that the victim could feel what Ms. Dollar felt by being beaten. The defendant claimed that the Ridgeways cleaned the victim's blood from their car. The next day, when Ms. Ridgeway told the defendant that the victim had died, Ms. Ridgeway urged the defendant not to turn himself in because, in her opinion, they were all accessories to the homicide.

Agent Wilson testified that when he interviewed the defendant in 2004, he saw no scars from the purported knife wound on the defendant's arms. Agent Wilson never recovered the knife allegedly used by the victim. On cross-examination, Agent Wilson said that approximately 10 officers assisted in the 2004 apprehension of the defendant to obtain palm prints which ultimately produced the defendant's statement. He reiterated that the defendant consented to the printing. Similarly, he said that the defendant volunteered his statement following his waiver of rights and that the completed statement was read aloud to the defendant to verify its accuracy. Agent Wilson testified that the defendant characterized the implement used to strike the victim as a "pan" rather than a wok.

With this proof, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal, the defendant presented proof.

Agent Billy Miller testified for the defendant that many items collected from the victim's trailer ultimately proved insignificant to the case. On redirect examination, he testified that although he requested both serology and DNA testing, the TBI Crime Laboratory performed only serology analysis on the items. He also recalled that Ms. Dollar was wearing "short shorts" and a tank top at the trailer on September 29 and that he saw no visible injuries to her.

Former SCSD Deputy Keith Herron testified that he assisted in collecting evidence relating to the victim's death. He recalled finding a pair of sandals in Barker Acres, approximately 10 to 12 miles from the victim's trailer, that were considered relevant to the investigation initially. On September 29, Deputy Herron interviewed Ms. Dollar's sons,

-8-

Messrs. Flores and Dollar.

Mark Beene testified that he was on Signal Mountain visiting Roberta Gattis, who was also known as Rosie Waters, on the evening of September 28 and early morning of September 29. He recalled that Tim Thurman, Noah Brown, and two boys, presumably Messrs. Flores and Dollar, were also at Ms. Gattis' residence that night. After midnight, "a woman named Monica" arrived at the residence. Mr. Beene said that he, Mr. Brown, Mr. Thurman, Josh Johnson, and "Monica" all "rode off the mountain" sometime late that night. He testified that "Monica" engaged in acts of a "sexual nature" with all of the men except Mr. Brown while the group was absent from Ms. Gattis' house. The men then dropped off "Monica" in front of Ms. Gattis' house, which was "[a] mile at most" from the victim's trailer. Mr. Beene testified that he was driving his brother's truck that night and that "Monica" left her sandals in the truck. When Mr. Beene returned home, his brother, Scotty, threw the sandals into the woods behind their home to prevent his girlfriend from finding them.

The parties stipulated that Scotty Beene told investigators that he went to his truck on the morning of September 29, saw the sandals, and threw them into the woods so his girlfriend would not see them. He later directed Deputy Herron to the sandals. Deputy Herron collected them as evidence in the investigation.

Dizzy Ridgeway testified that in 2002 she lived on Signal Mountain with her husband, Mark; her son, Kurt; and her granddaughter, Cassie. She recalled that her daughter, Monica Dollar, was living with the victim and her two sons in a trailer in Sequatchie County. Ms. Ridgeway testified that the defendant dated Cassie in September 2002. On September 28, 2002, "the guys was [sic] setting [sic] around drinking beer" at Ms. Ridgeway's home when Ms. Dollar telephoned and told her mother that she and the victim had been fighting.

On the way to purchase more beer, someone suggested checking on Ms. Dollar, so Ms. Ridgeway drove the group to the victim's trailer. Ms. Ridgeway testified that the defendant also "wanted to talk to" the victim. She testified that when the defendant confronted the victim, the two men started "fighting like hell." When the defendant returned to her vehicle, Ms. Ridgeway saw blood on the defendant's hands and pants. They did not find Ms. Dollar at the victim's trailer.

Ms. Ridgeway testified that she later learned that Ms. Dollar was at Ms. Gattis' home, where Ms. Dollar's two sons were staying. Ms. Ridgeway claimed she returned to the victim's trailer sometime after 1:00 a.m. to retrieve a blanket and other items belonging to Ms. Dollar. At one point, she picked up one of her grandsons from Ms. Gattis' home and brought him to her home. Unable to locate Ms. Dollar at that time, she learned the next

morning that Mr. Hayes had found Ms. Dollar sleeping on the victim's couch.

Ms. Ridgeway candidly admitted, "I often said I wished I was a man, so I could kick these men's ass[es] for beating on my girls." She testified, however, that she tried to stop the defendant from confronting the victim. She said that no one told the defendant "to go in there and do that." She recalled that when the defendant returned to her vehicle, he "got back in the car[,] he had blood on him . . . [and] he boasted about kicking [the victim's] ass." Ms. Ridgeway claimed that she would have called an ambulance had she known the severity of the victim's injuries.

Following a full *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 159,161-62 (Tenn. 1999), the defendant elected not to testify. After deliberations, the jury convicted the defendant, as charged, of first degree felony murder and especially aggravated burglary. The trial court imposed an automatic life sentence for the first degree murder, *see T.C.A.* § 39-13-208(c), and reduced the especially aggravated burglary conviction to aggravated burglary, *see id.* 39-14-404(d). The parties then agreed to the imposition of a concurrent sentence of three years' imprisonment for the aggravated burglary, resulting in an effective sentence of life in prison with the possibility of parole.

In addition to challenging the sufficiency of the evidence on appeal, the defendant also contends that the trial court erroneously denied his motion to suppress, erroneously admitted and excluded evidence, and erroneously amended the indictment by instructing the jury regarding an offense different than that charged in the indictment. Additionally, the defendant argues that the trial court's rulings indicated bias requiring recusal and that the cumulative effect of the errors deprived him of a fair trial. The defendant also alleges that the State failed to disclose exculpatory evidence in advance of trial when Agent Reid testified that her analysis revealed an unidentifiable fingerprint on the wok. The State urges this court to waive many of the defendant's issues due to the defendant's shortcomings in preserving many of the issues for appellate review or failing to cite to the record or authority in the argument portion of his brief. Alternatively, the State contends that any error committed by the trial court was harmless.

At the outset, we note that the transcript of the motion for new trial hearing is absent from the record. We caution the defendant that, as the appellant, he bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal," Tenn. R. App. P. 24(b). The absence of the motion for new trial hearing transcript in this case does not substantially hamper this court's ability to review the appellate issues raised by the defendant; therefore,

-10-

we will address each of the defendant's issues in turn.

*I. Sufficiency of the Evidence*

The defendant contends that the evidence is insufficient to support his conviction of first degree felony murder. He concedes that he was intoxicated on the night of September 28 and agreed, along with Ms. Dollar's family members, that the victim "needed 'his ass whooped.'" Likewise, he concedes that he fought the victim inside the victim's trailer and that he struck the victim with "a pan or griddle." The defendant argues, however, that there is insufficient evidence establishing that he committed a burglary, the underlying felony of the first degree murder charge, because the State failed to prove that the defendant entered the victim's trailer without the victim's effective consent, claiming instead that the evidence showed that the victim led the defendant into the trailer to escalate the fight. Likewise, the defendant argues that the proof failed to establish that the defendant's altercation with the victim caused the victim's death based upon inconsistent testimony from witnesses who saw the victim alive after the altercation. The State argues that the evidence sufficiently established the convictions.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id*. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

First degree murder, as pertinent to this case, requires proof of "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . burglary." T.C.A. § 39-13-202(a)(2). "A person commits burglary who, without the effective consent of the property owner enters a building . . . with intent to commit a felony, theft or assault." *Id*. § 39-14-402(a)(1).

-11-

The evidence in this case shows that Ms. Ridgeway drove the group to the victim's trailer. The defendant had previously indicated a desire to extract vengeance for the victim's alleged assault on Ms. Dollar. The defendant entered the victim's trailer and initiated a confrontation. As the two men fought for as long as 20 minutes, the defendant grabbed a wok from the kitchen stove and struck the victim on the head with the lid of the wok. Palm prints found on the wok lid matched those of the defendant. The defendant admitted to investigators that he "lost control" and beat the victim repeatedly with the wok lid, only stopping when he realized the victim was having difficulty breathing. After apologizing to the victim, the defendant left the victim bleeding on the bed where Mr. Hayes found the deceased victim the next morning. Blood spatter marked the bed, walls, and nearby window surrounding the victim. We conclude that the evidence sufficiently established the defendant's conviction of first degree murder.

*II. Motion to Suppress*

Next, the defendant contends that the trial court erroneously denied his motion to suppress. Referring to the Federalist Papers, the defendant makes the vague and non-specific argument that "[t]his case calls into question the overreaching and abuse of Article I, Sections 7, 8, and 9 of the Tennessee Constitution and, with that, violations of the Fourth, Fifth, Sixth and Fourteenth Amendments" of the United States Constitution. From our review of the defendant's appellate brief, we are able to discern four discrete bases in support of his argument: (1) that the warrant was based upon an anonymous tip unverified by the issuing magistrate, (2) that the warrant was nothing more than a "fishing expedition," (3) that the investigators acted unreasonably and should have sought a subpoena duces tecum to obtain the defendant's fingerprints rather than a "search and seizure warrant," and (4) that the defendant was compelled to incriminate himself by providing palm prints.

We note that each of these arguments dovetails into the other with little or no citation to authority, rendering it almost impossible to discern the actual basis for the defendant's argument. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived."). Similarly, the transcript of the hearing on the motion to suppress reflects an unfocused argument with scant reference to relevant case law.

The "Affidavit for Search and Seizure Warrant" made by Agent Wilson relates that the victim was found "beaten to death in his bed on the morning of September 29, 2002." Through the initial investigation, authorities learned that the victim "had been beaten to death with a blunt object." Investigators also discovered a piece of a wooden wok handle and "a wok covered in blood" at the scene. TBI Crime Laboratory analysis confirmed that the broken handle matched the wok found in the kitchen. Almost two years later, on August 18,

-12-

2004, the CPD received an anonymous telephone call. The caller reported that she knew the defendant and that the defendant confessed to her that he had beaten a man to death in a camper-trailer on Signal Mountain. The caller said that the defendant told her that he had used a "'kitchen thing . . . it was a griddle or waffle iron.'" The caller also advised that the defendant could be located through CPD arrest records. Investigators located the defendant's former employer, who directed them to the defendant's then-employer. The former employer indicated that the defendant had bragged about beating people "with bats and sticks." A review of CPD arrest records revealed that Kimberly Ables had been listed on a jail card as the defendant's wife. On September 10, 2004, Agent Wilson interviewed Ms. Ables. She reported that the defendant confessed to her that he beat a man to death with a wok sometime in 2002.

Based upon these facts, Agent Wilson obtained a warrant to "seize" the defendant. This "Search and Seizure Warrant," issued by Hamilton County Criminal Court Judge Douglas Meyer on September 14, 2004, directed officers to arrest the defendant to obtain the major case prints. On September 15, 2004, the officers apprehended the defendant at work, and the defendant consented to the officers' taking the prints. Later that day and after executing a waiver of rights, the defendant gave a statement to the investigators concerning his beating the victim.

Following the arguments of counsel, the trial court ruled that the officers acted reasonably in obtaining the defendant's major case prints by gathering facts to establish probable cause, affirming the facts via affidavit before a magistrate, obtaining a search warrant, and arresting the defendant to obtain the prints. The court also found that the defendant consented to the printing following his apprehension. Furthermore, the defendant relied heavily on his argument that the investigators conducted nothing more than a fishing expedition – an allegation that the trial court specifically ruled unfounded.

When reviewing a trial court's findings of fact and conclusions of law on a motion to suppress evidence, we are guided by the standard of review set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. When the trial court does not set forth its findings of fact upon the record of the proceedings, however, the appellate court must decide where the preponderance of the evidence lies. *Fields v. State*, 40 S.W.3d 450, 457 n.5 (Tenn. 2001). As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). We review the trial court's conclusions of law under a de novo standard without according any presumption of correctness to those conclusions. *See,*

-13-

*e.g.*, *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999).

As stated previously, our review of the suppression issue is hampered by the defendant's failure to cite to authority in his brief. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived."). Likewise, the defendant's arguments on appeal that the procedure followed by investigators in obtaining his prints forced him to incriminate himself or failed to comply with criminal procedure rules are also waived because the defendant failed to make these specific arguments before the trial court. *See* Tenn. R. Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context[.]"); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). As such, the defendant has waived the issues regarding the denial of his motion to suppress.

### III. Admission of Evidence During Agent Mark Wilson's Testimony

The defendant argues that the trial court erroneously admitted evidence during Agent Mark Wilson's testimony. The argument posed in the defendant's brief begins with a challenge to the trial court's rulings regarding leading questions and eventually evolves into a constitutional challenge to the admissibility of the defendant's statement taken by Agent Wilson on September 15, 2004. Once again, our review of this allegation is hampered by the defendant's failure to cite to relevant authority or make specific references to the record throughout much of the argument. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived.").

The defendant states that "Defendant's counsel addressed and assigned as trial errors instances where witnesses were allowed to respond to leading questions on substantive issues, despite objections timely raised. Such is the case with TBI Agent Mark Wilson." The defendant makes no specific reference to instances in the record where the trial court erroneously overruled his objections. In fact, the record reveals several instances when the trial court sustained the defendant's objections and warned the State against leading Agent Wilson during questioning. Furthermore, the defendant failed to cite authority in support of this argument. Under these circumstances, we cannot discern any erroneous rulings.

-14-

The defendant also claims that the trial court overruled his objections to leading questions posed by the State concerning the taking of the defendant's statement. It is unclear from the defendant's argument what aspect of Agent Wilson's testimony the defendant, in fact, challenges. In his brief, the defendant refers to the TBI's policy of not recording statements, the trial court's admission of a photograph of the defendant's arm showing no scarring from a purported knife injury suffered during the altercation with the victim, and the lack of "testimony dealing with the extent of any injury inflicted on [the defendant]." Once again, the defendant fails to cite any authority in support of his argument. And again, we perceive no error by the trial court.

Next, the defendant argues that "the TBI policy against recording any interviews is against public policy. The government agency vested with the power to seize a person off the street to see if there is any way to connect him to an unsolved crime . . . is not markedly different from the powers exercised by non-democratic nations." The defendant further argues that "[o]ur Supreme Court has chastised federal agencies for the use of tactics that offend the basic foundation of this nation." In the sense that this argument is an attempt to reiterate the defendant's previously-addressed challenge to the actions undertaken by the TBI to secure the defendant's palm prints and, ultimately, his statement, we have already addressed this allegation. Furthermore, the defendant once more fails to cite to any authority in support of these purported arguments, and, in that vein, they are waived.

*IV. Expert Testimony*

The defendant challenges the trial court's qualifying TBI Agent Elizabeth Reid as an expert in fingerprint analysis. He also claims, without citation to authority, that the trial court's allowing Agent Reid to testify as an expert is an example of "the bias of the trial judge in favor of the State and its clear lack of impartiality in the trial." The defendant characterizes the State's eliciting testimony from Agent Reid concerning her educational background, training, and qualifications as "asking questions that are generally innocuous and a waste of time." With only cursory reference to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the defendant claims that the trial court failed to properly qualify Agent Reid as an expert in fingerprint analysis. In essence, the defendant takes issue with the following exchange that occurred during Agent Reid's direct examination:

> Q:     And when you look at a fingerprint, what characteristics are you looking for?
> A:     We'[r]e basically looking for three things. One is called a dot, which is just exactly like it sounds. Another is called a ridge ending, which is just a ridge that comes to a stop. The

third is a bifurcation, which is a ridge that divides into two ridges.

Q:    Is there any set formula that you go by for examining a latent fingerprint?

A:    There's not a particular formula, but like I said, we're looking for that unit relationship in both prints.

The defendant characterizes Agent Reid's testimony that there is "not a particular formula" as an "admission" that "Ms. Reid (sic), as well as her co-workers at the TBI lab in her section, did not use standards," thereby rendering her testimony unreliable. At trial, the defendant objected to the qualification of Agent Reid as an expert and argued, " I don't think that Ms. Reid will testify as to any standards that she follows or any criteria she uses . . . and I think that raises serious questions about admissibility of scientific evidence where there are no standards or comparisons."

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and no reversal occurs on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2010); *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

In the present case, the defendant objected to Agent Reid's expert qualification in the area of fingerprint analysis based upon her statement that "[t]here's not a particular formula" utilized in determining a fingerprint match. The trial court ruled that Agent Reid possessed both the knowledge, training, and experience to testify as to specific characteristics of fingerprint analysis and the process of matching identifiable fingerprints. Contrary to the defendant's reference to one discrete phrase uttered during Agent Reid's testimony, Agent Reid's overall testimony displayed expertise in fingerprint analysis. Further, fingerprint analysis is not a novel type of expertise that has not been previously approved in Tennessee courts, and, therefore, the trial court was not required to make additional findings of

reliability prior to Agent Reid's testimony. *See State v. Ballard*, 855 S.W.2d 557 (Tenn. 1993). Accordingly, we conclude that the trial court committed no abuse of discretion in allowing Agent Reid's expert testimony in the area of fingerprint analysis.

## *V. The State's Failure to Disclose Evidence*

The defendant contends that the State failed to disclose "evidence in its possession that was arguably favorable to the defendant" by failing to disclose, in advance of trial, evidence of an unidentifiable palm print found on the wok. The State counters that the unidentifiable print, by nature, was not material and that early disclosure would not have changed the outcome of the trial.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

To prove a *Brady* violation, a defendant must demonstrate:

(1) that he requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not),

(2) that the State suppressed the information,

(3) that the information was favorable to the defendant, and

(4) that the information was material.

*Johnson*, 38 S.W.3d at 56 (citing *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995); *Walker*, 910 S.W.2d at 389). The evidence is deemed material if "there is a reasonable probability

-17-

that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678). In the case of a delayed disclosure of exculpatory information, as opposed to a complete failure to disclose, the inquiry is whether the delay prevented the defense from effectively preparing for and presenting the defendant's case. *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993); *see Bagley*, 473 U.S. at 682 (failure to respond to *Brady* request may impair adversary process because defense "might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued").

During Agent Reid's direct examination, she testified that a palm print found on the wok matched the defendant's palm print. During cross-examination, the parties learned for the first time that another unidentifiable palm print had also been recovered from the wok. On redirect examination, Agent Reid explained the difference between identifiable and unidentifiable prints and said that a match could not be made to the unidentifiable print because "there's just not enough information" to be gleaned from the print. In his motion for new trial, the defendant alleged that Agent Reid's failure to disclose the existence of the unidentifiable print prior to trial constituted a *Brady* violation.

In examining the elements of a *Brady* claim, we note that the defendant failed to file a motion for exculpatory information prior to trial. Further, it is unclear from the record before this court whether the State suppressed the information. When viewed in light of the prosecutor's comment that he first learned of the unidentifiable print during Agent Reid's testimony at trial, we discern that the State did not intentionally suppress the evidence. Our conclusion that the unidentifiable print neither helps nor harms the defendant's case is more significant to our analysis. It is innocuous given Agent Reid's testimony that an unidentifiable print necessarily defies identification. It does not necessarily follow that someone other than the defendant left the print. Therefore, the unidentifiable print could

neither exculpate nor incriminate the defendant, or anyone else for that matter, as the maker of the print. Further, the defendant admitted to striking the victim with a kitchen item, and the identifiable print confirmed that the defendant had handled the wok. With these considerations in mind, we cannot discern any materiality of late-disclosed evidence. Accordingly, the defendant failed to sustain his *Brady* claim, and the trial court committed no error in denying him relief on this basis.

## *VI. Indictment Amendment*

The defendant argues that the trial court improperly amended the indictment when it instructed the jury, regarding the elements of felony murder, that the murder was committed in the perpetration of an aggravated burglary, rather than a burglary as charged in the indictment. The State contends that the trial court's instruction of felony murder via an aggravated burglary was prompted by the defendant's argument that the felony murder indictment should be dismissed because any burglary that occurred would have necessarily occurred at a habitation, elevating the offense to an aggravated burglary as charged in count two of the indictment. The State argues that the indictment sufficiently alleged first degree murder and that it was unnecessary for the trial court to instruct regarding aggravated burglary as the predicate offense. Nevertheless, the State contends any error in the trial court's instruction inured to the benefit of the defendant because the instruction elevated the requisite level of proof.

Count one of the indictment alleged that the defendant "did unlawfully and recklessly kill Christopher Yeager, during the perpetration of a burglary, in violation of T.C.A. § 39-13-202."[3] The State correctly notes that the felony murder statute *generally* states the requisite underlying felonies associated with its application. Necessarily included in the list of requisite felonies is any other grade of the same felony. Thus, the indictment in this case automatically encompassed a murder committed in the perpetration of any burglary, including an aggravated burglary, which was applicable to the facts of this case when the defendant entered the victim's *residence* without his effective consent with the intent to commit an assault. Consequently, the trial court was not obliged to instruct the jury regarding aggravated burglary as the predicate offense. That being said, we agree with the State that the trial court's instruction regarding aggravated burglary as the underlying felony, while unnecessary, actually increased the burden of proof upon the State to establish the

---

[3] We note that the felony murder allegation erroneously included an element of recklessness, an error unnoticed by the trial court or either party. The element of recklessness was removed from the felony murder statute in July 1995, over seven years before the commission of this offense in September 2002. In any event, we deem the inclusion of "recklessly" in the indictment to be surplusage and of no effect on the propriety of the indictment in this case.

defendant's guilt of felony murder. This error enured to the benefit of the defendant. Accordingly, any error in the trial court's instruction was harmless, and the defendant is not entitled to relief on this issue.

## VII. Judicial Bias

The defendant contends that trial judge's rulings evince judicial bias requiring the trial judge's recusal. The State argues that this issue must fail because the defendant failed to seek recusal of the trial judge at any time during trial. Alternatively, the State contends that the record does not establish judicial bias.

A judge should recuse himself or herself whenever the judge's "impartiality [could] reasonably be questioned." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994) (quoting Code of Judicial Conduct, Canon 3(c) (now part of Tenn. Sup. Ct. R. 10, Canon 3(E)(1)). Further, recusal is appropriate "when a person of ordinary prudence in the judge's position . . . would find a reasonable basis for questioning the judge's impartiality." *Id.* (footnote omitted). Accordingly, a trial judge addressing a motion for recusal must determine whether he or she has a subjective bias against the defendant and whether the trial judge's impartiality could reasonably be questioned under an objective standard. *State v. Connors,* 995 S.W.2d 146, 148 (Tenn. Crim. App. 1998). Pertinent to the defendant's failure to seek recusal in the trial court, we note that "[w]hile a party should seek to take whatever action reasonably available to prevent or nullify an error[,] a trial judge must disqualify himself sua sponte under certain circumstances." *State v. Ernest Gentry Burton*, No. M2008-00431-CCA-R3-CD, slip op. at 11 (Tenn. Crim. App., Nashville, Aug. 3, 2009), *perm. app. denied* (Tenn. Dec. 14, 2009). However, adverse rulings by a trial court do not, standing alone, establish judicial bias requiring recusal of the trial court. *See, e.g., Herrera v. Herrera*, 944 S.W.2d 379, 397 (Tenn. Ct. App. 1996).

In the present case, the defendant's brief lists multiple adverse rulings relative to the admission or exclusion of evidence that the defendant claims shows the trial judge held some bias in favor of the State. Our review of the record indicates otherwise. The mere fact that the trial judge did not rule in favor of the defendant in every instance does not equate to judicial bias. The defendant is not entitled to relief on this issue.

## VIII. Exclusion of Statements as Hearsay

Next, the defendant argues that the trial court erroneously excluded the statements of Messrs. Flores and Dollar that the defendant sought to elicit through the direct

-20-

examination of Detective Herron. Citing to *Crawford v. Washington*, 541 U.S. 36 (2004), the defendant claims that the trial court's exclusion of the statements violated his right to confrontation because, he argues, the statements were nontestimonial hearsay and admissible through Detective Herron's testimony. The State argues that the defendant did not argue the admissibility of the statements via *Crawford* at trial, rendering this argument waived. Alternatively, the State argues that *Crawford* would not allow the admissibility of the statements because the statements were made to the investigators with the obvious purpose of possible use later at trial and were, therefore, testimonial. That being said, the State claims that the defendant failed to otherwise establish any basis for admitting the hearsay statements of Messrs. Flores and Dollar.

The Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court "'has largely adopted the standards used by the United States Supreme Court . . . in determining whether the Tennessee constitutional right has been violated.'" *State v. Parker*, 350 S.W.3d 883, 897-98 (Tenn. 2011) (quoting *State v. Maclin*, 183 S.W.3d 335, 343 (Tenn. 2006); *see also State v. Lewis*, 235 S.W.3d 136, 144 (Tenn. 2007).

In *Crawford v. Washington,* 541 U.S. 36 (2004), the United States Supreme Court departed from decades' long precedent and held for the first time that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* In *Crawford,* the Court laid the groundwork for what came to be known as "the primary purpose" test for distinguishing testimonial statements from nontestimonial statements. The Court refined the test in later opinions:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006). The Court noted that objective evaluation

of "the circumstances in which the encounter occurs and the statements and actions of the parties" is necessary to determine whether a statement is testimonial or nontestimonial. *Michigan v. Bryant*, 131 S. Ct. 1143, 1156 (2011).

In this case, Detective Herron interviewed Messrs. Flores and Dollar regarding the victim's death. Both gave statements that they saw the victim alive hours after the altercation with the defendant, giving credence to the defendant's theory that his assault did not cause the victim's death. At trial, the defendant attempted to elicit testimony from Detective Herron regarding specific times in the early morning of September 29, 2002, that each witness claimed to have seen the victim alive. The State objected on the basis of hearsay. Defense counsel argued that he "was not offering [the statements] to prove [a witness] was anywhere," in other words, that the statements were not being offered for the truth of the matters asserted. Defense counsel argued, however, that the witness's statements concerning their whereabouts during the night and early morning with reference to specific times were relevant to show the progression of Detective Herron's investigation.

The trial court commented, "Some leads pan out, some leads don't, but in the end what you're relating to the jury is what people say about the crime. They're not, apparently, going to be subject to cross-examination." The court then ruled that the defendant "wants the contents of the interview [admitted]. That's what you're asking [the witness] to put out, and that is definitely hearsay."

The State correctly notes on appeal that the defendant did not posit any argument for admissibility via *Crawford* during trial. At any rate, in our view, the defendant's reliance on *Crawford* is misplaced. The holding of *Crawford* is one of exclusion of testimony when admission of the evidence would violate a defendant's right to confrontation. *Crawford* does not, however, provide for the defendant's use of rank hearsay. The defendant failed to establish any basis for admissibility of this hearsay evidence. The trial court did not erroneously exclude the statements of Messrs. Flores and Dollar.

*IX. Admission of Autopsy Report*

The defendant contends that the trial court erroneously admitted the autopsy report as substantive evidence at trial. The defendant asserts that the autopsy report's admissibility was limited by Tennessee Rules of Evidence 803(5). He raises no Confrontation Clause issue with respect to the admission of the report. He claims that the report could be utilized only to refresh Doctor Harlan's recollection and should not have been admitted as substantive evidence. The State contends that the autopsy report was admissible via Rules 803(6), 803(8), and Tennessee Code Annotated section 38-7-110.

Initially, the State correctly asserts that, before the trial court, the defendant failed to articulate a basis for his objection to the admission of the autopsy report other than stating, "I'm objecting to the introduction of the report." In a keenly anticipatory fashion, the defendant asserts in his brief that "[t]he Court did not ask counsel for the rule or case authority for his objection." We remind the defendant that the burden is on the objecting party to state a specific ground of objection; the burden is not on the trial court to inquire of the basis of an objection. *See* Tenn. R. Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context[.]").

That being said, we further agree with the State that the autopsy report was admissible as substantive evidence under Rules 803(6) and 803(8). *See, e.g.*, *State v. Davis*, 141 S.W.3d 600, 622 & 630 (Tenn. 2004) (adopting the Court of Criminal Appeals' analysis and conclusions upholding the admission of autopsy reports as public documents under Rules 803(6) and 803(8)). Likewise, our Code provides that autopsy reports "shall be received as competent evidence in any court of this state of the facts and matters contained in the . . . reports." *See* T.C.A. § 38-7-110(a). Accordingly, we conclude that the trial court properly admitted the autopsy report in this case.

## X. Chain of Custody

Without citation to authority, the defendant contends that the trial court should not have admitted into evidence the wok, wok lid, and broken wok handle due to the State's failure to establish an adequate chain of custody. We could deem this issue waived on this basis. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived."). In any event, we conclude that the State sufficiently established the chain of custody predicate to the admission of these items into evidence.

"Whether the requisite chain of custody has been established to justify admission . . . is 'a matter committed to the discretion of the trial judge and [t]his determination will not be overturned in the absence of a clearly mistaken exercise thereof.'" *Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 267 (Tenn. 2009) (quoting *Shell v. Law*, 935 S.W.2d 402, 409 (Tenn. Ct. App. 1996)). Accordingly, this court will not reverse the trial court's ruling on the chain of custody "unless the trial court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

-23-

Although "it is 'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody,'" *Cannon*, 254 S.W.3d at 296 (quoting *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)), the general rule "does not require that the identity of tangible evidence be proven beyond all possibility of doubt," *id.* The State need not "call all of the witnesses who handled the item." *Id.* (citing *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). So long as the State can "reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.*

Agent Miller testified that he collected the items from the victim's trailer and submitted them to the TBI crime laboratory for analysis. He identified his notations on the evidence packaging and identified the items at trial. The forensic analysts who examined each item likewise identified the items and packaging. We conclude that the State "reasonably establish[ed] the identity and integrity of the evidence." *Id.* Consequently, the trial court did not err by admitting this evidence.

## *XI. Denial of Fair Trial Under Tennessee Constitution*

The defendant reiterates his arguments concerning judicial bias via a denial of fair trial claim under the Tennessee Constitution. Having already determined the claim of judicial bias to be without merit, we conclude that the defendant was not denied his right to a fair trial in this case.

## *XII. Cumulative Error*

Having considered each of the defendant's issues on appeal and concluded that the defendant is not entitled to relief for any, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one error committed.").

## *Conclusion*

The evidence is sufficient to support the defendant's convictions of first degree felony murder and aggravated burglary. The trial court committed no error requiring reversal. Accordingly, the judgments of the trial court are affirmed.

_____

JAMES CURWOOD WITT, JR., JUDGE